HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| PATRICIA BLACKBURN, DAVID CARPENTER, JACOB DAU, DENNIS FANT, BONIFACIO FORNILLOS, AKANELE IMO, JOSE LOPEZ, RALPH PETERSON, MATTHEW STALEY,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF WASHINGTON DEPARTMENT OF SOCIAL AND HEALTH SERVICES, WESTERN STATE HOSPITAL, DALE THOMPSON, MARY LOUISE JONES, LILA ROOKS, KELLY SAATCHI,<br><br>Defendant. | CASE NO. C11-5385 RBL<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 94) AND DENYING PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT (DKT. 109 & DKT. 113) |

This matter comes before the Court upon Defendants' Motion for Summary Judgment (Dkt. # 94), Plaintiffs' collective Motion for Partial Summary Judgment (Dkt. # 109), and Plaintiff Jacob Dau's separate Motion for Partial Summary Judgment (Dkt. # 113). Western State Hospital ("WSH") is a State-run psychiatric hospital in Lakewood, Washington. WSH provides inpatient treatment for individuals who suffer from serious long-term mental illness. The Plaintiffs are a group of nurses and Psychiatric Security Attendants ("PSA") who have

ORDER

worked at WSH. The group of Plaintiffs includes Caucasians, African-Americans, and members of other racial groups. This dispute arises out of administrative decisions related to the care of M.P., a WSH patient who threatened to kill Marley Mann, an African-American PSA. Neither M.P. nor Mann is a party to this litigation. Plaintiffs allege that Defendants adopted a discriminatory staffing directive that restricted darker-skinned PSAs from working with M.P. and consequently required the white PSAs to work with M.P. more frequently. Plaintiffs have alleged violations of Title VII, the 14th Amendment, and a number of statutes. They seek a permanent injunction and monetary damages. For the reasons state below, Defendants' motion is **GRANTED** and Plaintiffs' motions are **DENIED**.

## I.   BACKGROUND

M.P. is one of WSH's most dangerous patients. He has been a patient at WSH since 2004 and is housed in ward F-8. Ward F-8 exclusively houses male patients who have been found not guilty by reason of insanity. Since becoming a patient at WSH, M.P. has assaulted approximately 70 different people. At one point, he was kept either in restraints or in seclusion, nearly continuously, for over a year.

On September 24, 2009, Jacob Dau, a black PSA from Sudan, had been "pulled" from his normal assignment in a different ward to help with M.P. While Dau and other PSAs were helping M.P. take a shower, another PSA, Leon Kimmerling, told M.P. that "they eat white people in Africa," and then chomped his teeth together. WSH promptly investigated the incident and concluded that Kimmerling had made inappropriate racial comments to a co-worker in the presence of a patient. As punishment, WSH issued Kimmerling a written reprimand. He was not reinstated in his normal position in ward F-8 until after a different investigation into his

conduct on a separate matter concluded in October of 2010. Dau has not had any issues while working with M.P. and has not been forced work with Kimmerling since the incident.

A second, unrelated series of events forms the basis for the majority of Plaintiffs' claims. In late March of 2011, M.P. stopped taking his prescribed anti-psychotic medications. He became delusional and started to fixate on Marley Mann, one of the two PSAs regularly assigned to monitor him during the swing-shift. On the evening of March 24, 2011, M.P. accused Mann of poisoning his coffee and then threw his coffee at Mann. Later that night, M.P. again accused Mann of tampering with his coffee. While complaining to a nurse, M.P. directed a number of racial threats at Mann, who is black, including threats to kill him. After asking M.P. if another staff member would be safe monitoring him, the nurse reassigned a non-black PSA to monitor M.P. in Mann's place.

One of the day-shift staff members reported M.P.'s violent fixation with Mann to Dr. Mary Louise Jones, the Clinical Operations Director at WSH. Dr. Jones in turn discussed the matter with RN3 nurses Lila Rooks and Kelly Saatchi. RN3 nurses are in charge of making staff assignments. Dr. Jones asked Rooks and Saatchi to make sure that the staff members were safe. Although M.P. had only threatened Mann, Rooks and Saatchi mistakenly thought that M.P. had threatened all black staff members. Accordingly, they decided to restrict all black or dark-skinned PSAs from working with M.P. until his delusions subsided.

Plaintiffs contend that WSH issued a race-based staffing directive on Tuesday, March 29, 2011. Defendants claim that the directive was not issued until Friday, April 2, 2011. It is undisputed, however, that on Friday, April 2, someone wrote "NO BLACKS TO F8" on the white board in the RN3 office. The next day, an RN3 instructed Polly Blackburn (an RN2 charge nurse for ward F-5) to send three PSAs to different wards, including one to F-8. In

ORDER

accordance with the staffing directive, the RN3 told Blackburn that the PSA sent to F-8 had to be white.  Blackburn objected and refused to comply with the order.

On Tuesday, April 5, 2011, Blackburn filed an Administrative Report of Incidents ("AROI").  In the AROI, Blackburn complained that the staffing-directive was discriminatory and illegal.  The next day, Blackburn met with Saatchi and another RN3 to discuss the AROI.  Blackburn claims that Saatchi angrily told her "you should not have put this on an AROI, you should not have done this," "there is not going to be any investigation, there is nothing here but opinion, not fact," and "do you really want this in your file?  This is going to look really bad in your file."  Blackburn claims that the other RN3 also told her that she should have waited before filing a complaint.  Saatchi and the other RN3 dispute that they were verbally aggressive towards Blackburn.  They claim that they just told Blackburn that an AROI was not the appropriate method for filing this type of complaint.

On May 19, 2011, the Department of Justice issued all of the Plaintiffs right to sue letters.  Plaintiffs filed their Complaint with this Court that same day.  Plaintiffs allege that Defendants violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, the 14th Amendment, the 1st Amendment, 42 U.S.C. § 1981, 42 U.S.C. § 1985(3), and 42 U.S.C. § 1986.  Plaintiffs' Complaint also alleged violations of the Washington Law Against Discrimination, but they have voluntarily dismissed those claims without prejudice.  This Court denied Plaintiffs' motion for a preliminary injunction on August 12, 2011.  Defendants filed their motion for summary judgment on July 25, 2013.  On July 29, 2013, Plaintiffs collectively filed a cross-motion for partial summary judgment and Dau filed a separate motion for partial summary judgment on his hostile work environment claim.

## II. DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, there is no genuine issue of material fact which would preclude summary judgment as a matter of law. Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to present, by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986). In other words, "summary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable [fact finder] could return a [decision] in its favor." *Triton Energy,* 68 F.3d at 1220.

### A. Title VII Discrimination Claims

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against any individual based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). To prevail on a Title VII claim, the plaintiff must first establish a prima facie case of discrimination. *Vasquez v. Co. of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2004). If the plaintiff is able to establish a prima facie case, then the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its allegedly discriminatory conduct. *Id.* If the defendant is able to do so, then the burden shifts back to the plaintiff to show that the defendant's reason is mere pretext for discrimination. *Id.* At all times, the plaintiff bears the ultimate burden of proving that

1  the defendant intentionally discriminated against him or her. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089 (1981).

A plaintiff may establish a prima facie case through direct or circumstantial evidence of discriminatory intent, or through the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973). "Direct evidence is evidence which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Aragon v. Republic Silver St. Disposal, Inc.*, 292 F.3d 654, 662 (9th Cir. 2002) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir.) (internal quotations omitted) (alterations in original)).

Plaintiffs argue that WSH's decision to restrict black employees from working with M.P. constitutes direct evidence of discriminatory intent because the directive explicitly called for race-based staffing assignments. On its face, the staffing directive distinguished between WSH's black employees and its other employees. It is not clear from the terms of the directive alone, however, whether WSH issued the directive with the intent to treat its black employees less favorably than other employees or if it was issued for more innocuous reasons. Plaintiffs therefore have not offered any direct evidence that Defendants acted with discriminatory intent. Because Plaintiffs have not offered direct evidence of discriminatory intent, they must establish their case through the *McDonnell Douglas* framework or through other circumstantial evidence.

To establish a prima facie case under the *McDonnell Douglas* framework, Plaintiffs must show that (1) they belong to a protected class; (2) they were qualified for their positions; (3) they were subject to an adverse employment action; and (4) similarly situated individuals outside the protected class were treated more favorably. *Chuang v. U. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1121 (9th Cir. 2000). Plaintiffs are unable to establish a prima facie case under this

ORDER

framework because they cannot show that they suffered an adverse employment action. An adverse employment action is a significant change in employment status, such as discharge, demotion, or undesirable reassignment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998). The only change in employment status that Plaintiffs claim to have suffered is not being assigned to work with M.P. Not having to work with a violent, racist patient is not an adverse employment action. In short, Plaintiffs cannot prove that they were treated less favorably than other employees under the staffing directive.

Even if the Court assumes that Plaintiffs have established a prima facie case of discrimination through circumstantial evidence, Defendants have articulated a legitimate, non-discriminatory reason for the staffing directive. Defendants maintain that they issued the race-based staffing directive due to safety concerns. Specifically, given M.P.'s violent disposition and recently-made racist comments, Defendants claim that they believed M.P. posed a serious risk to all black PSAs. When considering a defendant's non-discriminatory reason for its actions it is not important whether the employer's justification is objectively false. *Villiarimo v. Aloha Is. Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002). What is important is whether the employer "honestly believed its reason for its actions." *Id.* It therefore does not matter that M.P.'s racist and threatening comments were directed at a specific employee and not at all black employees. What is important is that the WSH managers who made the decision to restrict black staff members from working with M.P. did so because they believed that ignoring the perceived threats would unnecessarily place the staff in danger.

Because Defendants have articulated a non-discriminatory reason for their actions, Plaintiffs must show that Defendants' justification is pretextual. "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of

credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang,* 225 F.3d at 1127 (citing *Godwin,* 150 F.3d at 1220–22).

As discussed above, Plaintiffs have not offered any direct evidence to suggest that WSH intended to discriminate against any of its employees. To show pretext by circumstantial evidence, Plaintiffs must point to specific and substantial evidence that calls WSH's motives into question. *Vasquez*, 349 F.3d at 642. Plaintiffs have contended that WSH instituted the race-based staffing directive not out of legitimate safety concerns, but rather to appease M.P. To support their contention, Plaintiffs point to the March 24, 2011 incident when an RN3 asked M.P. if he would like a different PSA to be assigned to him and then accommodated his request. This evidence is not inconsistent with WSH's tendered non-discriminatory reason, however. The nurse who reassigned the staff testified that she did so because she was concerned for Mann's safety. Further, Plaintiffs' evidence in no way suggests that Defendants actions had any discriminatory intent. In sum, Plaintiffs are unable to show that they were treated less favorably than other individuals because of their race and that WSH intended to discriminate them in any way. Plaintiffs' Title VII discrimination claims fail as a matter of law.

**B.     Equal Protection Claims**

A plaintiff asserting a § 1983 claim alleging a violation of equal protection must prove that the defendant acted in a discriminatory manner and that the discrimination was intentional. *Fed. Deposit Ins. Corp. v. Henderson*, 940 F.2d 465, 472 (9th Cir. 1991). As discussed above, there are no facts that could lead a reasonable fact finder to conclude that Defendants issued the challenged staffing directive with the requisite discriminatory intent. Plaintiffs' equal protection claims fail as a matter of law.

### C. Conspiracy Claims

A plaintiff asserting a claim under 42 U.S.C. § 1985 or 42 U.S.C. § 1986 must prove that there was "discriminatory animus" behind the alleged conspirators' actions. *Griffin v. Breckenridge*, 403 U.S. 88, 91, S. Ct. 1790 (1971). Like Plaintiffs' Title VII claims, their §§ 1985 and 1986 conspiracy claims fail as a matter of law because there is no evidence that the Defendants acted with discriminatory intent.

### D. Retaliation Claims

To establish a prima facie case of retaliation, plaintiffs must show that (1) they were engaged in a protected activity; (2) they suffered a materially adverse action; and (3) that there is a causal link between the two. *Villiarimo*, 281 F. 3d at 1064. In this context, a materially adverse action is any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006).

Blackburn argues that Saatchi retaliated against her for filing an AROI by yelling at her and threatening her. Citing *Dahlia v. Rodriguez*, 2013 WL 4437594, (9th Cir. 2013), Blackburn contends that minor threats can constitute a materially adverse action, even if they are not actually followed through with. In *Dahlia*, the district court dismissed the plaintiff's 42 U.S.C. § 1983 First Amendment retaliation claim under Fed. R. Civ. P. 12(b)(6) for, among other things, failing to allege a materially adverse action. The 9th Circuit reversed and held that being placed on administrative leave and even minor acts of retaliation, including threats, can infringe upon an employee's First Amendment rights. The plaintiff, who was a police detective, reported his fellow officers for their misconduct during a robbery investigation. He alleged that one of the officers that he reported called him into his office, closed the door and blinds, took out his gun, looked at it, and then placed it in his desk drawer. The officer then told the plaintiff, "Fuck with

me and I will put a case on you, and put you in jail. I put all kinds of people in jail, especially anyone who fucks with me!"

Even when the evidence is viewed in the light most favorable to Blackburn, the retaliation that she complains of does not compare to the retaliation in *Dahlia*. Unlike being told by a police officer who just displayed his gun that he would "put a case on you" and "put you in jail," being told that "this is going to look really bad in your file" is not likely to dissuade a *reasonable* employee from reporting perceived discrimination. Blackburn has cited no authority suggesting otherwise.

### E.   Dau's Hostile Work Environment Claim

To prevail on a Title VII hostile work environment claim, a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial or sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the plaintiff's employment conditions and create an abusive environment. *Vasquez*, 349 F.3d at 642. The work environment must be both subjectively and objectively hostile. *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 113 (9th Cir. 2004). Factors to consider when evaluating whether the work environment was objectively hostile include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001).

As a matter of law, Kimmerling's conduct was not severe or pervasive enough to constitute a hostile work environment. The conduct that Dau claims created the hostile work environment was a single, isolated event. Dau was not physically threatened and was not subsequently forced to work anywhere near Kimmerling. Moreover, WSH promptly investigated the matter and punished Kimmerling for his conduct. Kimmerling's remarks may

have been offensive, possibly humiliating, and certainly distasteful, but Dau was not subjected to an objectively hostile work environment.

### III.   CONCLUSION

Plaintiffs have failed to establish that they were treated less favorably than other employees because of a protected trait and that Defendants acted with any discriminatory intent. In other words, Plaintiffs have failed to establish that they were discriminated against. Plaintiffs have also failed to establish that they were retaliated against for reporting the perceived discrimination or for filing this lawsuit. Therefore, Plaintiffs' motions for partial summary judgment are DENIED and Defendants' motion for summary judgment is GRANTED.

Dated this 25th day of September, 2013.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE